UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF IDAHO

In re:

MICHAEL F. MARLIN,

Bankruptcy Case
No. 19-41200-JMM

Debtor.

## MEMORANDUM OF DECISION

Appearances:

Ryan Farnsworth, AVERY LAW, Idaho Falls, Idaho, attorney for Debtor.

Rhett Michael Miller, PARSONS, SMITH, STONE, LOVELAND and SHIRLEY, Burley, Idaho, attorney for Trustee.

### *Introduction*

Before the Court are several motions in this chapter 7[1] case. The trustee, Gary L. Rainsdon ("Trustee"), objects to the debtor Michael F. Marlin's ("Debtor") claims of exemption in real and personal property, as well as financial accounts, Dkt. No. 46, and also seeks turnover of certain financial statements and funds, Dkt. No. 40. Debtor responded to the objections, and also moved to compel abandonment of the real property. Dkt. No. 53. The Court conducted an evidentiary hearing on January 6, 2021, and heard

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM OF DECISION − 1

oral closing arguments on January 22, 2021, after which the objections and motions were deemed under advisement.

After considering the briefing, testimony, exhibits, and oral argument presented, as well as the applicable law, the Court issues the following decision which resolves the matters under advisement.  Fed. R. Bankr. P. 7052; 9014.

### *Applicable Law*

At the evidentiary hearing on January 6, 2021, the parties stipulated that California exemption law applies to this case.  The Court accepts that stipulation and will forego the § 522(b)(3)(A) analysis.

### *Relevant Facts*

In 1991, Debtor purchased a lot in Pahoa, Hawaii.  In 1998 and again in 2004 he acquired adjacent lots, which give him approximately an acre and a half of property (collectively "the Property").  Exs. 231–233.  At the back of two of the parcels is a ravine, which limits the amount of usable ground on those lots.  The Property is approximately five miles from the ocean and does not have an ocean view.  It sits between lava flows, one of which is four miles away and has been dormant since 2003, and other is six miles away and had been inactive since 2018, but recently became active again.  When the lava is flowing, the sulfur in the air can be so strong it is hard to breathe, and is toxic enough to kill some vegetation.  The threat presented by the active volcano and resulting lava flows means there is no running water or sewer system, requiring local residents to rely on catch basins to obtain water.  While there is a power

MEMORANDUM OF DECISION − 2

grid in the area, it tends to fail from time to time when there are strong storms or hurricanes, so Debtor has installed solar power on the Property.

At the time Debtor purchased the first lot, there existed a small shack on the parcel down in the ravine, referred to as the "Grotto House."  It was rustic, with no running water, power, or indoor bathroom facilities, although there is an outdoor outhouse nearby. In 2014, Debtor added a larger home on that same parcel ("Home"). The Home has an indoor bathroom and solar power, but the shower is solar heated and is located outdoors. The Home also has both a garage and a porch.  Debtor testified the Home was 80 percent complete in 2016, but the evidence is not clear that it is "finished" at this time.  On one of the other lots, there is a shack with a "Balinese" roof, and on the third lot there is a plastic storage shed.

Debtor's purchase of the two additional lots permitted him to plant fruit and nut trees, and other food-producing plants, which enable him to eat some of what he grows locally.  Some of those plants had to be planted many years before they began to bear fruit.  Upon his return to the property in March 2020, he planted a vegetable garden, palms, another stand of bananas, papayas, and sugar cane.  He also stocked a small pond on one of the parcels with fish that he hopes will grow to "eating size."  Finally, Debtor has an agreement with a local apiarist to keep beehives on one of the parcels of Property in exchange for some of the honey.

Debtor testified that since he purchased the original parcel in 1991, he has been setting down roots with an intent to retire on the Property one day.  Since the purchase,

MEMORANDUM OF DECISION – 3

however, it has been his pattern to work on the mainland for much of the year, and then return to Hawaii for several months to live and work on the Property. Debtor testified that he has not been employed in Hawaii since the late 1980's or early 1990's. Instead, for over twenty years, Debtor was employed in a touring theatrical production called "LUMA: Art in Darkness," which artistically explored the concept of "dark skies."[2] Debtor typically lived on the Property for several months each year, during which time he would spend many hours contacting agents and venues in an attempt to market and book LUMA shows for the next touring season. While Debtor often lived and worked on the mainland, he did not sign any lease or long-term rental, but instead stayed in hotels, friends' homes, or lived in his vehicle. Over the years, the show had toured much of the United States and had at least one international booking, but only once did LUMA perform in Hawaii due to the lack of venues and the cost of bringing the cast and props over from the mainland.

Despite Debtor's efforts, beginning in about 2008, the bookings became less and less frequent. The last tour was in 2016; a block of performances was given in a single location in 2017, followed by a final performance in 2018. Unfortunately, Debtor came to the realization that he could not sustain the show financially, and his tax returns indicate he incurred substantial losses.

---

[2] Debtor is also something of an expert on astrotourism, and occasionally lectures on the subject.

MEMORANDUM OF DECISION − 4

With LUMA shuttered, Debtor still needed to earn an income.  He had a long-time friend who lived in Bellevue, Idaho and owned a business there.  She invited him to stay with her, so he brought the show props with him and placed them in storage in Bellevue. He rented a room in his friend's home, and while there was no written lease, he paid approximately $400-500 per month in rent, which included utilities.  During 2018 and 2019, Debtor was able to find seasonal work in Bellevue as a waiter at the Valley Club, in a greenhouse, as counter help at a deli, and as a substitute teacher.  He waited tables at the Valley Club from Mother's Day through the end of September, after which he returned to Hawaii and remained there during October and November, and then returned to Bellevue to work the holiday season through Valentine's Day in February.  On March 10, 2020, Debtor returned to the Property after which came the advent of COVID-19, essentially forcing Debtor to remain there.

For a few years, Debtor has had one additional source of income.  He advertised both the Home and the Grotto House for rent using booking platforms such as Airbnb and VRBO.  Ex. 235.  The rental is seasonal, generally November–March, and he described the home as being "sporadically rented."  Although Debtor originally set up the accounts on the booking websites, his friend in Idaho now manages those rental agreements, and has possession of the login and password information.

In 2018, Debtor established bank accounts in Idaho into which his wages and rental income from the Property were deposited, and he used his friend's post office box as his address.  Exs. 101; 102; 207–26.  He has no bank accounts in Hawaii, and does his

MEMORANDUM OF DECISION − 5

banking business online.  Using the Bellevue address, Debtor obtained an Idaho driver's license when his Hawaii license expired, and he keeps a 2000 Honda Odyssey in Idaho and a 2004 Honda Civic in Hawaii.  Finally, Debtor has filed tax returns in Hawaii since at least 2014, including in 2019.  Exs. 204–05.  He also filed a tax return in Idaho in 2019, due to his earnings there.  Ex. 206.

Debtor testified that he valued the three parcels combined at $175,000.  He obtained two market analysis opinions and introduced those as evidence of value.  Exs. 103–104; 227.  Both opinions highlight the issues with the location (no ocean view, no running water or sewer system, and the threat of the lava flows), along with the fact that Debtor's structures were built without permits, as many are in that area.  *Id.*  The first market analysis valued the parcel with the Home and Grotto House on it at between $82,500 and $88,000.  Ex. 103.  The second analysis valued that parcel at $90,000, and via email, the value of the other two parcels was estimated at $45,000 apiece.  Exs. 103; 227.  Notably, both of the analyses indicate the market decreased significantly following the 2018 lava flow that destroyed many homes in the area.  *Id.*  Debtor testified that the lava began flowing again in late 2020.  He further testified that lenders will not loan funds to purchase property under these conditions, so property purchases must be in cash or seller-financed.

Also in evidence are the tax assessor's notices for each of the three parcels.  Exs. 228–230.  Debtor testified that the assessed value fluctuates with the lava flow as well as the designation of "agricultural" or "homeowner" status, and the assessor's values bear

MEMORANDUM OF DECISION − 6

that out. *Id*. According to the assessor's office, the parcel with the Home and Grotto House, 12-179 Kipuka Street, had a 2019 assessor's market value of $135,600. Ex. 228. The parcel bore a "homeowner" designation in that tax year. *Id.* The prior year, however, that parcel also had "homeowner" status, but the market value was $79,200. *Id.* As stated above, Debtor testified the lava began flowing again in 2018. Moreover, in 2012 and 2013, this parcel had "agricultural" status and the market value was $51,200 and $55,000 respectively. *Id.* The following year, 2014, the status changed to "homeowner" and the market value increased to $115,000. *Id.*

A second parcel, 12-7104 Kalaunu Street, on which the fruit trees are planted, had been designated as "agricultural" in 2018, and the assessed value was $40,400, but in 2019 it was redesignated as "homeowner" and the assessed value rose to $67,300. Ex. 229. Finally, the third parcel, located at 12-7110 Kalaunu Street, upon which sit the beehives and pond, was similarly designated as "agricultural" until 2019. Ex. 230. The 2018 assessed value was $40,400, and the 2019 "homeowner" assessed value was $67,400. *Id.* The total of the 2019 assessed values for the three parcels, with the "homeowner" designation, is $270,400. However, the total of the 2018 assessed values, with the "agricultural" designation, is $160,000. Relevant to the current valuation, Debtor testified that he applied to have the property redesignated as "agricultural" rather than "homeowner," and that such request had been granted for the 2020 tax year. Also significantly, lava began flowing again in late 2020, which, if history repeats itself, might reduce the market value somewhat.

MEMORANDUM OF DECISION − 7

On December 27, 2019, Debtor filed a bankruptcy petition.  Exs. 100; 200.  He was 63 years old at the time.  His petition listed the Bellevue, Idaho home where he rented a room as his address.  *Id.*  On Ex. 202, some of the personal property listed is in Idaho, but most is in Hawaii.  Debtor claimed a home located at 12-179 Kipuka St. Pahoa, Hawaii exempt under California law in the amount of $175,000.  Exs. 100; 200. He initially claimed the home was worth $80,000, but later amended his schedules and increased the value of the home to $175,000.  Dkt. No. 71.  Trustee objected to the claim of exemption.  Dkt. No. 73.  Debtor also claimed several bank accounts and a vehicle exempt, to which Trustee also objected.  Dkt. Nos. 32; 46; 71; 73; 80; 84.

### *Analysis and Disposition*

1.  Objection to Homestead Exemption

When a debtor files a Chapter 7 petition, all of the debtor's legal or equitable interests in property become property of the estate, subject to the debtor's right to reclaim certain property as exempt.  *Diaz v. Kosmala (In re Diaz)*, 547 B.R. 329, 334 (9th Cir. BAP 2016) (citing *Schwab v. Reilly,* 560 U.S. 770, 774, 130 S. Ct. 2652, 177 L. Ed. 2d 234 (2010)).  In this case, Debtor has sought to exempt the value of the Property in the amount of $175,000 pursuant to California law, specifically Cal. Civ. Proc. Code ("C.C.P.") § 704.730.[3]  California has opted out of the federal exemption scheme, C.C.P.

---

[3] While some of the California exemption statutes at issue here were fairly dramatically amended effective January 1, 2021, the claims and objections are subject to the prior statutory language.

MEMORANDUM OF DECISION − 8

§ 703.130, and therefore the validity of the exemption is controlled by California law. *In re Diaz,* 547 B.R. at 334 (citing *LaFortune v. Naval Weapons Ctr. Fed. Credit Union (In re LaFortune),* 652 F.2d 842, 846 (9th Cir. 1981)). Moreover, like Idaho, California has placed the burden of proof on the party claiming the exemption, despite the text of Rule 4003(c). *In re Diaz*, 547 B.R. at 337.

    *A. Applicable Homestead Exemption Amount*

    Initially, the Court will consider whether Debtor qualifies to claim the maximum homestead exemption, as he did, and then secondarily whether the Property is exempt.

    Debtor claimed the Hawaii property[4] exempt under C.C.P. § 704.730, which provides as follows, in relevant part:[5]

---

[4] Under California law, the fact that the Property is located outside of California is not an impediment to the claim of exemption. *In re Arrol,* 207 B.R. 662, 664 (N.D. Cal. 1997).

[5] The version of C.C.P. § 704.730 in effect at the time provided:

    (a) The amount of the homestead exemption is one of the following:
        (1) Seventy-five thousand dollars ($75,000) unless the judgment debtor or spouse of the judgment debtor who resides in the homestead is a person described in paragraph (2) or (3).
        (2) One hundred thousand dollars ($100,000) if the judgment debtor or spouse of the judgment debtor who resides in the homestead is at the time of the attempted sale of the homestead a member of a family unit, and there is at least one member of the family unit who owns no interest in the homestead or whose only interest in the homestead is a community property interest with the judgment debtor.
        (3) One hundred seventy-five thousand dollars ($175,000) if the judgment debtor or spouse of the judgment debtor who resides in the homestead is at the time of the attempted sale of the homestead any one of the following:
            (A) A person 65 years of age or older.
            (B) A person physically or mentally disabled who as a result of that disability is unable to engage in substantial gainful employment. There is a rebuttable presumption affecting the burden of proof that a person receiving disability insurance benefit payments under Title II or supplemental security income payments under Title XVI of the federal

MEMORANDUM OF DECISION − 9

(a) The amount of the homestead exemption is one of the following:

(3) One hundred seventy-five thousand dollars ($175,000) if the judgment debtor or spouse of the judgment debtor who resides in the homestead is at the time of the attempted sale of the homestead any one of the following: * * * * *

    (C) A person 55 years of age or older with a gross annual income of not more than twenty-five thousand dollars ($25,000) or, if the judgment debtor is married, a gross annual income, including the gross annual income of the judgment debtor's spouse, of not more than thirty-five thousand dollars ($35,000) and the sale is an involuntary sale.

Because Debtor was 63 years old and not disabled at the time of the bankruptcy filing, he must demonstrate he had gross annual income of $25,000 or less and the sale is an involuntary sale, in order to qualify for the $175,000 homestead exemption.

The case law is clear that "gross annual income" for purposes of determining entitlement to the homestead exemption is not the equivalent of "adjusted gross income" under the Internal Revenue Code. *In re Dowling*, 415 B.R. 740, 748 (Bankr. N.D. Cal. 2009). Instead, gross income must be determined on a case by case basis depending on the particular circumstances. *Id.* (citing *Shelley v. Kendall (In re Shelley)*, 184 B.R. 356, 359 (9th Cir. BAP 1995)). In the case at bar, however, the Court need not wrestle with

---

Social Security Act satisfies the requirements of this paragraph as to his or her inability to engage in substantial gainful employment.
(C) A person 55 years of age or older with a gross annual income of not more than twenty-five thousand dollars ($25,000) or, if the judgment debtor is married, a gross annual income, including the gross annual income of the judgment debtor's spouse, of not more than thirty-five thousand dollars ($35,000) and the sale is an involuntary sale.

MEMORANDUM OF DECISION − 10

the difficult question of what deductions from gross income are permissible under the circumstances.

Debtor's 2019[6] tax returns are part of the Court's record.  On his 2019 federal income tax return, Debtor claimed $12,473 in wages, $11 in dividend income, $1,630 in business income, and $2,655 in rental income.  Ex. 204.  This income totals $16,769.  His 2019 Hawaii return shows the same income plus $2,640 in "other income"[7] for total income of $19,769.[8]  Ex. 205.  Finally, his Idaho Non-resident and Part-year resident tax return indicates the same $19,769 in income.  Ex. 206.  Thus, it appears that Debtor's income is below the $25,000 threshold, regardless of any subsequent deductions. Moreover, the requirement that the sale be an involuntary sale has been met, as the filing of a bankruptcy petition is the functional equivalent of a forced or involuntary sale under California law.  *In re Bush*, 346 B.R. 207, 208 (Bankr. S.D. Cal. 2006) (citing *Katz v. Pike (In re Pike),* 243 B.R. 66, 70 (9th Cir. BAP 1999)).  Accordingly, if Debtor meets the other requirements, Debtor will qualify for the $175,000 exemption.

---

[6] Exemptions are generally determined as of the bankruptcy filing date.  *Wolfe v. Jacobson (In re Jacobson),* 676 F.3d 1193, 1199 (9th Cir. 2012).  Because Debtor filed his petition on December 27, 2019, his 2019 income is relevant to the Court's analysis.

[7] The return lists the sources of that "other income" as the State of Nebraska Department of Admissions and Ballet Sun Valley.  The Debtor provided no explanation about that income.

[8] All returns show a $3,000 capital loss, which the Court ignores in this instance.

MEMORANDUM OF DECISION − 11

### B.  California Homestead Exemption Requirements and Analysis

The exemption claimed by Debtor in this bankruptcy case is the "automatic" homestead exemption as opposed to the one claimed by declaration.  The automatic homestead exemption protects a debtor from a forced sale and requires that the debtor reside in the homestead property at the time of a forced sale.  *Kelley v. Locke (In re Kelley),* 300 B.R. 11, 17 (9th Cir. BAP 2003); *Redwood Empire Prod. Credit Ass'n v. Anderson (In re Anderson),* 824 F.2d 754, 757 (9th Cir. 1987); C.C.P. §§ 704.710(a)–(c), 704.720, 704.730, 704.740.

C.C.P. § 704.710 defines a homestead as "the principal dwelling (1) in which the judgment debtor or the judgment debtor's spouse resided on the date the judgment creditor's lien attached to the dwelling, and (2) in which the judgment debtor or the judgment debtor's spouse resided continuously thereafter until the date of the court determination that the dwelling is a homestead.  The term "dwelling" is also defined, and it means "a place where a person resides." § 704.710.

Deconstructing the statute, Debtor must be able to show 1) he resided at the Hawaii property 2) on the date the judgment creditor's lien attached to the dwelling, and 3) he "resided continuously thereafter."

Because the "date the judgment creditor's lien attached to the dwelling" is the petition date, *Salven v. Galli (In re Pass),* 553 B.R. 749, 757 (9th Cir. BAP 2016), the Debtor must demonstrate that he resided on the Property on the petition date, and that he resided continuously thereafter.  The decisions interpreting this exemption statute regard

MEMORANDUM OF DECISION − 12

the purpose of the "continuous residency" requirement as one designed to prevent a judgment debtor from moving into a property after the creation of a judgment lien or levy in order to establish an exemption. *Hastings v. Holmes (In re Hastings),* 185 B.R. 811, 814 (9th Cir. BAP 1995).  However, the requirement of "continuous residency" is met when a bankruptcy petition filing occurs.  "[I]n a case where the filing of the petition serves as the hypothetical levy, a debtor will always satisfy the continuous occupancy requirement of the California automatic homestead exemption because the date of attachment and the date of the court determination that the exemption applies occur simultaneously." *In re Diaz*, 547 B.R. at 334–37.

Accordingly, the focus of this Court's inquiry centers around the first element: Debtor's residency at the Property on the petition date.  The decisions interpreting this exemption consider as most relevant the physical fact of occupancy of the property and the debtor's intention to live there.  *In re Kelley,* 300 B.R. at 21 (citing *Ellsworth v. Marshall,* 196 Cal. App. 2d 471, 474, 16 Cal. Rptr. 588 (1961)).  However, the case law is clear that a lack of physical occupancy is not necessarily fatal to establishing an automatic homestead exemption so long as the intent to return is proven.  *In re Diaz,* 547 B.R. at 335 ("California courts have long held that a lack of physical occupancy does not preclude a party from establishing actual residency and claiming the homestead, if the claimant intends to return.")

There is no question that Debtor did not physically occupy the Property on the date he filed his bankruptcy petition, but rather he was renting a room at his friend's

MEMORANDUM OF DECISION − 13

home in Bellevue, Idaho at the time. However, if he can demonstrate an intention to return and reside there, then he will qualify for the exemption.

The Court concludes Debtor has adequately proven his intention to reside on the Property. The following factors inform that conclusion. First, Debtor owns no other real estate, and his rental history suggests a series of short-term, sporadic rentals. In other words, he has no other place to return to. Second, Debtor has continuously made improvements to the Property, including building a larger home and planting fruit and nut trees with an eye to future sustainable living. Third, Debtor acquired the adjoining parcels so that he would have additional usable ground upon which to plant those trees and his garden. Finally, when questioned during the hearing about whether he ever stays anywhere else when he is in Hawaii, he reiterated that he did not because the Property "is [his] home" and repeatedly testified under oath of his intention, since 1991, to retire and live on the Property. To contradict this testimony, the Trustee introduced a May 30, 2016 Facebook post in which Debtor announced his decision to sell the Property. Ex. 235. However, Debtor explained the post, testifying that he was in a difficult place emotionally at that time, but that he never listed the Property for sale. Because that post occurred over three years prior to the bankruptcy filing and Debtor never acted on that "decision," and in light of his direct testimony of his intention to reside on the Property, the Court does not assign much weight to the Facebook post.

While Debtor has spent a good deal of time living away from the Property, he has satisfactorily explained to the Court his somewhat nomadic existence on the mainland

MEMORANDUM OF DECISION − 14

during his wage-earning years.  In fact, the Property is the sole aspect of permanence in

Debtor's life for the last twenty years.  The Court concludes that Debtor has adequately

proven his intention to reside on the Property.  Because he has met all the elements

necessary to establish an automatic homestead under California law, the Court will

overrule Trustee's objection to Debtor's claim of homestead.

2.  Objection to Exemption of Bank Accounts

Next, Trustee objects to Debtor's claim of exemption in four bank accounts, two

savings and two checking.  All of the accounts at issue are located at Pioneer Federal

Credit Union.  One savings account and one checking account are described by Debtor as

being his "personal" accounts, while the other checking and savings accounts he calls his

"Sweet Spot" accounts.  Specifically, Debtor claimed the following checking and savings

accounts exempt under C.C.P. 704.070:

> 1.  Checking account 1846 0001 at Pioneer Federal Credit Union, claimed exempt under C.C.P. § 704.070 in the amount of $676 ("personal checking");
>
> 2.  Savings account 1846 0040 at Pioneer Federal Credit Union claimed exempt under  C.C.P. § 704.070 in the amount of $1,769 ("personal savings");
>
> 3.  Checking account at Pioneer Federal Credit Union Sweet Spot claimed exempt under C.C.P. § 704.070 in the amount of $1,981 ("Sweet Spot checking"); and
>
> 4.  Savings account at Pioneer Federal Credit Union Sweet Spot claimed exempt under C.C.P. § 704.070 in the amount of $1,836 ("Sweet Spot savings").

The Trustee objected to these exemption claims.  The Court will consider each of these

accounts.

MEMORANDUM OF DECISION − 15

*A.  Governing Law*

The version of C.C.P. 704.070 effective on the date of filing[9] reads as follows, in relevant part:

> (b) Paid earnings that can be traced into deposit accounts or in the form of cash or its equivalent as provided in Section 703.080 are exempt in the following amounts:
>> (2) Seventy-five percent of the paid earnings that are levied upon or otherwise sought to be subjected to the enforcement of a money judgment are exempt if prior to payment to the employee they were not subject to an earnings withholding order or an earnings assignment order for support.

The tracing of the funds referred to in subsection (b) is addressed in C.C.P. 703.080, which provides:

> (a) Subject to any limitation provided in the particular exemption, a fund that is exempt remains exempt to the extent that it can be traced into deposit accounts or in the form of cash or its equivalent.
> (b) The exemption claimant has the burden of tracing an exempt fund.
> (c) The tracing of exempt funds in a deposit account shall be by application of the lowest intermediate balance principle unless the exemption claimant or the judgment creditor shows that some other method of tracing would better serve the interests of justice and equity under the circumstances of the case.

The term "earnings" is defined under California law as "compensation payable by an employer to an employee for personal services performed by such employee, whether denominated as wages, salary, commission, bonus, or otherwise." C.C.P. § 706.011. Moreover, the term "paid earnings" is also statutorily defined as earnings that "were paid

---

[9] The statute was amended effective Jan. 1, 2020.

MEMORANDUM OF DECISION − 16

to the employee during the 30–day period" prior to "the date of the levy" on the relevant account. § 704.070(a)(2). The "date of the levy" is the petition date. *In re Adlawan*, No. 14-53190-ASW, 2015 WL 3934900, at *1 (Bankr. N.D. Cal. June 25, 2015).

In this case, Debtor seeks to exempt the funds in the bank accounts as "paid earnings" under C.C.P. § 704.070. If those funds can be traced as such, seventy-five percent of the funds will be exempt. § 704.070(b)(2). Because the petition was filed on December 27, 2019, the 30 days prior to that date are November 26, 2019–December 26, 2019. Any wages paid to Debtor prior to November 26, 2019 which remain in his accounts on the petition date will not qualify for this exemption. *Sourcecorp, Inc. v. Shill*, 206 Cal. App. 4th 1054, 1061, 142 Cal. Rptr. 3d 414, 418 (2012) (Under § 704.070, "[w]hether it be a fistful of dollars or $100,000 in a safe, once a debtor has had 30 days to pay for the necessities of life out of exempt earnings, the remainder becomes available to satisfy the debtor's outstanding obligation to a judgment creditor.") Under California law, "exemptions are wholly statutory and cannot be enlarged by the courts." *Ford Motor Credit Co. v. Waters*, 166 Cal. App. 4th Supp. 1, 8, 83 Cal. Rptr. 3d 826, 830 (Cal. App. 2008). Nevertheless, they should be construed to the benefit of the debtor. *Id.*

### B. Personal Accounts

Debtor's personal checking account showed a balance of $220.60 on November 26, 2019. Exs. 101; 212–13. There were five deposits into that account during the relevant period between November 26, 2019 and December 26, 2019, leaving a $676.42 balance on December 27, 2019. *Id.* Those deposits are reflected in the table below.

MEMORANDUM OF DECISION − 17

| Personal Checking Account Deposits | | |
|---|---|---|
| Date | Amount | Source |
| 12/04/2019 | $    9.37 | Withdrawal Adjustment/Point of Sale @ OfficeMax |
| 12/06/2019 | $  95.28 | Deposit Transfer from Share 0001 |
| 12/09/2019 | $    9.21 | Deposit Transfer from Share 0001 |
| 12/14/2019 | $300.00 | Deposit Home Banking Transfer from Share 0001 |
| 12/19/2019 | $595.54 | Direct Deposit from the Valle [Valley Club] |

Considering each of the deposits, it is unclear what the $9.37 OfficeMax adjustment/point of sale transaction is, however there was no testimony or other evidence before the Court to suggest that Debtor was ever employed by OfficeMax.  As such, the Court finds this deposit is not traceable to paid earnings.  Regarding the $595.54 direct deposit from "the Valle," the Court concludes this amount is paid earnings traceable to Debtor's employment at the "Valley Club" in Idaho, according to Debtor's testimony.  Because those were paid earnings within the thirty days prior to filing, 75% of that amount, or $446.66, will be exempt and $148.88 will not be exempt.[10]

Finally, the three deposits labeled "Transfer from Share 0001" are transfers from Debtor's personal savings account to his personal checking account, as there are

---

[10] C.C.P. § 703.080(c) requires tracing by the "lowest intermediate balance principle," which assumes that the traced proceeds are the last funds withdrawn from a commingled account.  *In re Skagit Pac. Corp.*, 316 B.R. 330, 338 (9th Cir. BAP 2004).  If the traced proceeds are withdrawn and spent, they are treated as lost and no longer available, even if subsequent deposits are made into the account.  *Id.*; *Gen. Elec. Capital Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049, 1060 (8th Cir. 2005).  As such, the exempt funds may not exceed the lowest balance occurring at any time between the deposit of the exempt funds and the time of the levy.  *Qmect, Inc. v. Burlingame Cap. Partners II, L.P.*, 373 B.R. 682, 687 (N.D. Cal. 2007) (citing *Franco v. Gennaco*, No. LA CV 09-00893 VBF, 2015 WL 1383525, at *4 (C.D. Cal. Mar. 23, 2015)).  Because the amount of the exempt wages in Debtor's personal checking account never exceeded the lowest balance in the account between the time of deposit and the bankruptcy petition filing, this principle need not be applied in this case.

MEMORANDUM OF DECISION − 18

corresponding withdrawals from Debtor's personal savings account on those dates.  *Id.*

An examination of Debtor's personal savings account indicates a starting balance on November 26, 2019 of $2,199 and $1,769.97 remaining on the petition date.  During that time period, the only deposit into the personal savings account is a dividend payment totaling $.13 on November 30, 2019.  Accordingly, the only paid earnings deposited into Debtor's personal savings or checking accounts during the relevant 30-day period was the direct deposit from the Valley Club.  All other funds in those accounts are not exempt.

   *C.  "Sweet Spot" Accounts*

Debtor owns a second set of checking and savings accounts he refers to as the "Sweet Spot"[11] accounts.  Exs. 101; 223–24.   On November 26, 2019, the Sweet Spot savings account had $1,836.03 in it, and on the petition day, December 27, 2019, the account had $.05 more, resulting from a dividend on November 30, 2019.  *Id.*  The Sweet Spot checking account had more activity during this period, however.  On November 26, 2019, that account had $328.16 in it, but after several deposits, it had a balance of $1,981.52 on December 27, 2019.  *Id.*  The deposits are as follows:

| Sweet Spot Checking Account Deposits | | |
|---|---|---|
| Date | Amount | Source |
| 12/12/2019 | $424.50 | Airbnb Payments |
| 12/17/2019 | $339.50 | Airbnb Payments |
| 12/24/2019 | $790.55 | Airbnb Payments |
| 12/26/2019 | $793.43 | Homeaway |

---

[11] Debtor refers to the Property as his "Sweet Spot;" generally, he utilized these accounts for renting out the Hawaii property.

MEMORANDUM OF DECISION − 19

As noted above, Debtor offered his Home and the Grotto House for rent on various booking sites[12] during the periods he was working on the mainland.  Debtor generally just listed the home on the booking platforms, and occasionally promoted the Property on his Facebook page, although he acknowledged that he did little to market the property as a rental.  While the Airbnb and VRBO/HomeAway accounts are in his name, he testified he has no control over them.  Rather, his friend in Idaho has the login and password information and manages the rentals as part of their "business arrangement." The Court concludes Debtor has not carried his burden to prove the rental income qualifies as paid earnings, as Debtor is neither the employee of VRBO or Airbnb, nor did the rental constitute "personal services performed by such employee"; thus they are not exempt.  C.C.P. § 706.011; *In re Gokey,* 152 B.R. 750, 751 (Bankr. N.D. Cal. 1993).

Accordingly, the exemption status of the accounts is as follows:

| Total Exempt/Non-Exempt Amounts | | | |
|---|---|---|---|
| Account | Total on 12/27/19 | Non-Exempt | Exempt |
| Personal Checking | $676.42 | $229.76 | $446.66 |
| Personal Savings | $1,769.97 | $1,769.97 | $0 |
| Sweet Spot Checking | $1,981.52 | $1,981.52 | $0 |
| Sweet Spot Savings | $1,836.08 | $1,836.08 | $0 |
| Total | $6,263.99 | $5,817.33 | $446.66 |

Trustee's objection to Debtor's claims of exemption in the deposit accounts will therefore be sustained in part and overruled in part.

---

[12] The rental earnings for the home are listed as deposits from both Airbnb and HomeAway, the latter of which is rental income from the VRBO booking platform.

MEMORANDUM OF DECISION − 20

3.  Objection to 2000 Honda Odyssey

*A.  Procedural Issues*

Debtor originally claimed the 2004 Honda Civic as exempt under the tools of the trade exemption.  Dkt. No. 1.  Following the evidentiary hearing, however, it became clear that Debtor had inadvertently claimed the exemptions on the wrong vehicles.  The Court permitted Debtor to amend schedule C to fix the error, after which Trustee objected to the amended claim of exemption in the Odyssey.  Dkt. Nos. 80; 84.  However, Trustee's objection was filed using negative notice and the Debtor never responded.  When the objection period had passed, Trustee filed a notice of non-objection and requested entry of an order sustaining the objection to the claim of exemption in the Honda Odyssey, which the clerk's office entered.  Dkt. Nos. 91; 92.  While this technically renders any analysis of this issue moot, the Court will nevertheless include in this decision a discussion of the merits of Trustee's objection, as the Court reaches the same result.

*B.  Legal Standard and Analysis*

In his amended papers, Debtor claimed a 2000 Honda Odyssey as exempt under California's "tools of the trade" statute, C.C.P. § 704.060, to which Trustee objected.  The version of that statute in effect at the time Debtor filed his bankruptcy petition provides, in relevant part:

(a) Tools, implements, instruments, materials, uniforms, furnishings, books, equipment, one commercial motor vehicle,[13] one vessel, and other personal property are exempt to the extent that the aggregate equity therein does not exceed:

(1) Six thousand seventy-five dollars ($6,075), if reasonably necessary to and actually used by the judgment debtor in the exercise of the trade, business, or profession by which the judgment debtor earns a livelihood.

* * * * *

(c) Notwithstanding subdivision (a), a motor vehicle is not exempt under subdivision (a) if there is a motor vehicle exempt under Section 704.010 which is reasonably adequate for use in the trade, business, or profession for which the exemption is claimed under this section.

C.C.P. § 704.060.

In *Kono v. Meeker*, the court noted that "the evident purpose and policy of the [tools of the trade] exemption is to protect the basic tools and utensils necessary to aid the debtor in continuing in his means of livelihood." 196 Cal. App. 4th 81, 89, 126 Cal. Rptr. 3d 208, 213 (2011) (citing *Sun Ltd. v. Casey*, 96 Cal. App.3d 38, 40 (1979) [construing former exemption statutes].)

The evidence before the Court demonstrates that the Odyssey is currently located and titled in Idaho. Debtor purchased the vehicle in order to move the show props and cast around for the 2017 tour. Unfortunately for Debtor, the testimony also shows that LUMA is shuttered and has not had a booking since 2018. More importantly, there was no testimony that he expects the show to resume; in fact, the evidence is that bookings

---

[13] The term "commercial vehicle" is defined under California law. Cal. Vehicle Code § 260. In subsection (b) the statute provides: "Passenger vehicles and house cars that are not used for the transportation of persons for hire, compensation, or profit are not commercial vehicles." As such, Debtor's Odyssey cannot be classified as a commercial vehicle for purposes of the exemption statute.

MEMORANDUM OF DECISION – 22

became increasingly infrequent, and Debtor incurred large losses and ultimately could not

financially sustain the performances.  As such, Debtor no longer needs the Odyssey to

shuttle props and performers to booking engagements.

The facts also demonstrate that Debtor has been working as a waiter, substitute

school teacher, and has had the rare opportunity to give lectures.  He also has engaged in

the business of renting out his property in Hawaii to overnight guests.  Thus, Debtor's

primary sources of income are a combination of these employment types, none of which

require the use of the Honda Odyssey as a tool of the trade.  In addition, the California

case law is clear that Debtor's use of the vehicle when he is in Idaho to transport himself

back and forth from his lodgings to the Valley Club or any of the other locations wherein

he finds employment, does not give rise to a tool of the trade exemption. *In re Rawn,* 199

B.R. 733, 736 (Bankr. E.D. Cal. 1996) ("the debtor's use of a vehicle as means of

transportation to and from work does not constitute a necessary tool of the trade subject

to exemption.")  Accordingly, Trustee's objection to Debtor's claim of exemption in the

Odyssey as a tool of the trade under C.C.P § 704.060 would have been sustained on the

merits had it not already been done so procedurally.

4.  Trustee's Motion for Turnover

On May 21, 2020, Trustee filed a motion for turnover pursuant to § 542 and

521(a)(4).  Dkt. No. 40.  In general terms, he sought statements from Debtor's financial

institutions, including investment accounts; the funds in Debtor's accounts on the date he

filed his petition; all rental income Debtor received since the filing date; all funds Debtor

MEMORANDUM OF DECISION − 23

received from the rental booking agencies after the petition date, along with any Covid

stimulus funds he received relating to the rental of the Home; and his login and password

information for the rental booking websites.

At the hearing, Trustee contended that he still needed statements from sources

such as PayPal, American Express, Hawaii Credit Union, Merrill Lynch, Airbnb, and

VRBO, as well as the login credentials for the latter two websites.  Trustee also noted that

neither the funds in the financial accounts nor the rental income received after the filing

had been turned over.

Pursuant to § 521(a)(4) of the Bankruptcy Code, if a trustee is serving in the case,

the Debtor must "surrender to the trustee all property of the estate and any recorded

information, including books, documents, records, and papers, relating to property of the

estate . . . ."  Accordingly, Debtor is required to turn over the requested statements from

PayPal, American Express, Hawaii Credit Union, Merrill Lynch, Airbnb, and VRBO.

§ 542.[14]  Moreover, Trustee is entitled to learn about any rental income that was received

by the Debtor after the filing of the bankruptcy petition, and thus Debtor must also turn

over the login credentials for all rental platforms used by Debtor, including

VRBO/HomeAway and Airbnb.  Finally, Debtor is required to turn over all non-exempt

---

[14] Section 542(a) provides: "an entity . . . in possession, custody, or control, during the case, of property
that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under
section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such
property, unless such property is of inconsequential value or benefit to the estate."

MEMORANDUM OF DECISION − 24

funds in his personal and Sweet Spot accounts.  According to the table above, the amount

subject to turnover is $5,817.33.

5.  Debtor's Motion to Compel Abandonment

Finally, Debtor moved for abandonment of the Property, arguing it is fully exempt

and thus of inconsequential value to the bankruptcy estate.  Dkt. No. 53.  Abandonment

in this instance is governed by § 554(b) which provides that "[o]n request of a party in

interest and after notice and a hearing, the court may order the trustee to abandon any

property of the estate that is burdensome to the estate or that is of inconsequential value

and benefit to the estate."

Because the Court has ruled that Debtor is entitled to the homestead exemption

claimed, it may appear that the question of abandonment is moot.  But this is not exactly

correct.  In the case of personal property, the effect of an exemption is that the debtor's

interest in the property is "withdrawn from the estate (and hence from the creditors) for

the benefit of the debtor." *Gebhart v. Gaughan (In re Gebhart)*, 621 F.3d 1206, 1210

(9th Cir. 2010) (quoting *Owen v. Owen,* 500 U.S. 305, 308, 111 S. Ct. 1833, 114 L. Ed.

2d 350 (1991).  Homestead exemptions, however, are different in that they do not permit

the exemption of the entire asset, but are limited to specific dollar amounts.  In

interpreting these exemptions, the Supreme Court in *Schwab v. Reilly (In re Reilly)* held

that exemptions claimed under statutes like these are limited to the dollar value claimed

in the exemption.  560 U.S. 770, 130 S. Ct. 2652, 177 L. Ed. 2d 234 (2010).  Thus, even

when a debtor claims an exemption in an amount that is equal to the full value of the

MEMORANDUM OF DECISION − 25

property as stated in the petition and that exemption is upheld, the asset itself remains in the estate, and only the "interest" in the property equal to the value of the exemption claimed is removed from the estate. *In re Gebhart*, 621 F.3d at 1210.

The Court recognizes it is certainly possible the Property has no value above the exempt amount for Trustee to administer for the benefit of Debtor's creditors. This may be especially likely now that the lava has begun flowing again. However, the market value of the Property was not firmly established, and therefore Debtor has not met his burden to prove the Property is of inconsequential value to the bankruptcy estate. Moreover, the Court is cognizant that an order to compel abandonment is "the exception, not the rule." *Gill v. Kirresh (In re Gill)*, 574 B.R. 709, 714 (9th Cir. BAP 2017) (citing *Viet Vu v. Kendall (In re Viet Vu)*, 245 B.R. 644, 647 (9th Cir. BAP 2000)). For those reasons, the Court concludes that abandonment is not proper, and will deny Debtor's motion.

### *Conclusion*

Following the facts and analysis discussed above, the Court concludes that Trustee's objection to Debtor's claimed homestead exemption is overruled. Regarding the checking and savings accounts, Trustee's objection to the claims of exemption are sustained in part and overruled in part. Of the $6,263.99 in Debtor's deposit accounts when he filed his bankruptcy petition, the Court concludes that only $595.54 are traceable to paid wages. Accordingly, seventy-five percent of that amount, or $446.66, is

MEMORANDUM OF DECISION − 26

exempt, and the remaining funds in those accounts are not protected by the paid earnings exemption.

Furthermore, Trustee's objection to Debtor's claim of exemption in the Honda Odyssey as a tool of the trade is also sustained due to Debtor's lack of response to Trustee's objection; however an analysis on the merits yields the same result.  Next, Trustee's motion for turnover is granted in all aspects in accordance with this decision. Finally, Debtor's motion to compel abandonment of the Property is denied.

A separate order will be entered.

DATED:  February 26, 2021

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION − 27